## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

CHAMPAGNE METALS, an                     )
Oklahoma limited liability company,      )
                                         )
                    Plaintiff,           )
v.                                       )         NO.  CIV-02-0528-HE
                                         )
KEN-MAC METALS, INC., an Ohio            )
corporation, ET AL.,                     )
                                         )
                    Defendants.          )

## ORDER

Plaintiff Champagne Metals, an aluminum distributor or "service center," filed this antitrust action against seven other service centers – Ken-Mac Metals , Inc. ("Ken-Mac"), Samuel, Son & Co., Ltd., Samuel Specialty Metals, Inc. (collectively "Samuel"), Metalwest, LLC, Integris Metals, Inc. ("Integris"), Earle M. Jorgensen Co. ("EMJ"), and Ryerson Tull, Inc. ("Ryerson") (collectively the "Established Distributors").  Plaintiff claims defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by engaging in a horizontal group boycott, violated the Oklahoma Antitrust Reform Act, 79 Okla. Stat. § 203, by unreasonably restraining trade, and tortiously interfered with its business and contractual relationships.  Summary judgment was previously entered in defendants' favor on all claims, but that decision was reversed in part on appeal. Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073 (10th Cir. 2006).

As the Tenth Circuit opinion gives a detailed summary of the dispute, the court will not repeat the facts here except as necessary to explain its conclusions.  Briefly summarized,

plaintiff claims the Established Distributors conspired "to attempt to keep a new, aggressive entrant out of the market," <u>Champagne Metals</u>, 458 F.3d at 1086, by threatening to move their business from the mills that sold them aluminum, if those mills dealt with Champagne Metals.

A <u>James</u>[1] hearing was held the weeks of November 10 and 17, 2008, to determine the admissibility of various coconspirator hearsay statements, most of which plaintiff claims were made by representatives of the mills which supplied aluminum to the distributors. A <u>Daubert</u> hearing also was held to determine the admissibility of the testimony of Steve L. Wilsey, plaintiff's damages expert. The court's rulings pertaining to the <u>James</u> hearing, as well as its disposition of defendants' objection to the Wilsey testimony and defendants' renewed motion for summary judgment, are addressed below.

## I. <u>Admissibility of Coconspirator Hearsay</u>

Fed. R. Evid. 801(d)(2)(E) permits the admission of an out-of-court statement "by a coconspirator of a party during the course and in furtherance of the conspiracy." For a statement to be admissible, plaintiff must establish by a preponderance of the evidence that a conspiracy existed, that the declarant and defendant against whom the statement is offered were members of the conspiracy, and that the statement was made in the course of and in furtherance of the conspiracy. <u>United States v. Lopez-Gutierrez</u>, 83 F.3d 1235, 1242 (10th Cir. 1996). In making the determination of whether a conspiracy has been established,

---

[1] See generally <u>United States v. James</u>, 590 F.2d 575 (5th Cir.1979).

the court considered the testimony and exhibits offered at the hearing, as well as plaintiff's proffer and defendants' responses.

The court initially must decide whether plaintiff has shown by a preponderance of the evidence that a conspiracy existed.[2]  The applicable legal principles are well established. "[I]t has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy ...." United States v. General Motors Corp., 384 U.S. 127, 142-43 (1966); Esco Corp. v. United States, 340 F.2d 1000, 1008 (9th Cir. 1965) ("Mutual consent need not be bottomed on express agreement, for any conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy ..... An exchange of words is not required.") (internal citation omitted).   However, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).   "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Id.  Plaintiff must "present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently," id. (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)), and, "if the factual context renders [the plaintiff's] claim implausible-if the claim is one that simply makes no economic sense-[the plaintiff] must come forward with more persuasive evidence to support [its] claim than

---

[2]The court previously concluded that plaintiff had demonstrated the existence of a genuine issue of material fact as to whether the Established Distributors entered into a conspiracy, a different question than that which must be decided now.  July 27, 2007, Order, p. 6.

would otherwise be necessary." *Id.* at 587.

While "circumstantial evidence may support the existence of an illegal § 1 agreement," Mitchael v. Intracorp. Inc., 179 F.3d 847, 858 (10th Cir. 1999), the acceptable inferences that may be drawn from it "'vary with the plausibility of the plaintiff['s] theory and the danger associated with such inferences.'" *Id.* (quoting In re Baby Food Antitrust Litig., 166 F.3d 112, 124 (3d Cir. 1999). "[C]onsciously parallel behavior may contribute to a finding of antitrust conspiracy, [but] it is insufficient, standing alone, to prove conspiracy. Such parallel behavior may, however, support the existence of an illegal agreement when augmented by additional evidence from which an understanding among the parties may be inferred." *Id* at 859 (internal citation and quotations omitted). The required additional evidence "may include a showing that the parties 'are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior.'" *Id.* (quoting Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n of Kansas, 891 F.2d 1473, 1481 (10th Cir. 1989). Courts traditionally have found concerted action even where one of the alleged conspirators may have been coerced to participate in an illegal scheme. MCM Partners, Inc. v. Andrews-Bartlett & Assocs., 62 F.3d 967, 973-74 (7th Cir. 1995); *see* Spectators' Commc'n Network Inc. v. Colonial Country Club, 253 F.3d 215, 221 (5th Cir. 2001) ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman

Act."); Systemcare, Inc. v. Wang Labs. Corp., 117 F.3d 1137, 1145 (10th Cir. 1997) (coerced action satisfies the "concerted action element of section 1 of the Sherman Act" in antitrust action alleging a tying arrangement).

In determining "whether, for purposes of the co-conspirator hearsay exception, the evidence makes the existence of a conspiracy more likely than not," the court may consider both hearsay and independent evidence. Champagne Metals, 458 F.3d at 1081 & n.6. "[U]nder Bourjaily, 'there need only be some independent evidence linking the defendant to the conspiracy.' United States v. Martinez, 825 F.2d 1451, 1453 (10th Cir.1987). Such independent evidence may be sufficient even when it is not 'substantial.'" United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996). "[I]individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.... [A] piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence." Champagne Metals, 458 F.3d at 1081 n.6 (quoting Bourjaily v. United States, 483 U.S. 171, 179-80 (1987)).

The court starts from the premise that plaintiff has advanced a very credible economic

theory[3] for the alleged conspiracy[4] and offered some direct evidence of collusive action.[5]

Building on that is circumstantial evidence,[6] which the court finds suffices to demonstrate

by a preponderance of the evidence the existence of at least a tacit agreement[7] among all

defendants and the mills[8] to take collective action to exclude new entrants from the market,

---

[3]Champagne Metals, 458 F.3d at 1087.

[4]The Tenth Circuit concluded that "Champagne's theory makes sense-it is certainly economically rational for a group of established firms to attempt to keep an aggressive competitor out of the market, whether they are doing so to protect profits or simply to guard market share." Champagne Metals, 458 F.3d at 1087.

[5]The Circuit found that the statement by Phil Wiley of AFCO to Matt Zundel of Commonwealth that "'himself and other potential customers ... would cause other' service centers to remove their business from Commonwealth if Commonwealth continued selling to Champagne," viewed in the light most favorable to Champagne Metals, constituted direct evidence of "an agreement among service centers to take collective action." Champagne Metals, 458 F.3d at 1083-84. However, the court also concluded that a reasonable jury could not find defendants had entered into an illegal agreement on the basis of Wiley's statement, alone. Id. at 1084.  The court recognizes that plaintiff is not entitled, in conjunction with the James hearing, to the same deferential summary judgment standard of review, but finds nonetheless that the cited statement amounts to direct evidence of collusive action.

[6]As "the alleged conspiracy is economically rational, ... restrictions on the inferences drawn from Champagne's circumstantial evidence are not warranted." Champagne Metals, 458 F.3d at 1085.

[7]Bell Atlantic Corp. v. Twombly, 550 U.S. 544, ___ (2007) ("'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" (quoting Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540 (1954)).

[8]The court finds that, at least with respect to plaintiff, the conspiracy began in 1996 and continued if not to date, close to a decade. Commonwealth's participation was brief, limited essentially to the time period surrounding its refusal to honor its initial contracts with the plaintiff.

in this case Champagne Metals, an aggressive, price-cutting, potential competitor.[9] *See e.g.*, James P-Exhibit 53 ("Champagne covets a number of Samuel accounts.").[10]  Simply put, the mills, at least in part due to pressure and threats from the defendant service centers, refused to supply plaintiff with the products it needed to compete in the aluminum industry and which they otherwise would have supplied in the absence of the concerted pressure.  *See* General Motors Corp., 384 U.S. at 140 ("We have here a classic conspiracy in restraint of trade: joint, collaborative action by dealers, the appellee associations, and General Motors to eliminate a class of competitors by terminating business dealings between them and a minority of Chevrolet dealers ...."); Interstate Circuit v. United States Paramount Pictures Distrib. Co., 306 U.S. 208, 227 (1939) ("Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful

---

[9]While the court generally found Mike Champagne and most of plaintiff's other witnesses to be credible, it was not persuaded by the testimony of several defense witnesses.  For example, the testimony of the Samuel's representative purporting to explain his email suggesting that Samuel's president contact the president of Ormet was not credible.  Similarly, the testimony of Debbie Veale, which recounted with complete assurance and certainty what she did not say during a conversation that occurred several years previously, appeared rehearsed and less than persuasive.  In addition, the testimony of one of the defendant's CEO's to the effect that not only had he not discussed whether a mill should sell to Champagne Metals with another service center, but that no one in his organization had done so, struck the court as going beyond what any CEO would plausibly know about the acts of lower level employees in these large and sometimes far-flung corporations.

[10]The evidence, though disputed, persuaded the court that Samuel had attempted to buy Champagne Metals for a million dollars before the company was even established.  This evidences the industry's view of plaintiff's potential impact on the marketplace.

conspiracy under the Sherman Act."); Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 764-72 (8th Cir. 2004); Spectators' Commc'n Network, 253 F.3d at 215, 221; Rossi v. Standard Roofing, Inc., 156 F.3d 452, 456-79 (3d Cir. 1998); *see generally* MCM Partners, Inc. v. Andrews-Bartlett & Assocs., 62 F.3d at 972-75 (allegations that two exhibition contractors refused to rent equipment from plaintiff because of threats of labor disruption and damage to property made by "a union official in cahoots with the would-be monopolist" or competitor sufficed to state a claim under § 1 of the Sherman Act).

In reaching this conclusion the court recognizes that "[i]ndependent action is not proscribed," and that "[a] [mill] of course has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto, 465 U.S. at 761. It also realizes that "something more than evidence of complaints is needed," *id*. at 764, or "mere acquiescence to a competitor's complaints about a price-cutter be present to infer a conspiracy." Abraham v. Intermountain Health Care Inc., 461 F.3d 1249, 1262 (10th Cir. 2006). However, viewing the circumstantial evidence "through the lens of a highly plausible economic theory," Champagne Metals, 458 F.3d at 1087, the court concludes plaintiff has established that the defendant service centers and mills "'had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto, 465 U.S. at 764 (quoting Edward J. Sweeney & Sons, 637 F.2d 105, 111 (3d Cir. 1980)).

This is one of those situations where consciously parallel behavior is sufficiently "augmented by additional evidence from which an understanding among the parties may be inferred." Mitchael, 179 F.3d at 859 (internal citation omitted). Here, for reasons discussed

8

subsequently, there was both "motivation [for the service centers] to enter into an agreement requiring parallel behavior," and "a showing that the [mills were] acting against their own individual business interests," when they refused to sell aluminum to plaintiff.  *Id.  See* Abraham, 461 F.3d at 1263 (inference of antitrust conspiracy may be based on response to complaints, when coupled with evidence of "plus" factors,  such as threats or coercion).

Plaintiff established that Mike Champagne, a knowledgeable, competent businessman, started Champagne Metals with an established customer base (horse trailer industry) and a reasonable belief that he had the equipment (a cut-to-length line)[11] and suppliers (mills) needed to establish a successful aluminum service center.  However, as soon as he launched the business, Champagne Metals was confronted with a series of obstacles and events unlikely to have occurred in the absence of concerted effort by the other service centers and the acquiescence of several mills.

Different pieces of evidence in combination suffice to establish the predicate conspiracy.  Among them was Commonwealth's conduct in its initial sales negotiations with plaintiff.  The mill had agreed to recognize plaintiff, actual orders had been placed, James

---

[11]Mike Champagne had worked in the aluminum industry for approximately 13 years before he started Champagne Metals.  While employed at EMJ, Champagne had discussions with management about forming a company which essentially would take over EMJ's horse trailer business, as it appeared EMJ was not interested in continuing that part of its operations.  Champagne had proposed buying the equipment needed, a cut-to-length line, from EMJ and been virtually assured EMJ would sell it to him..

P-Exhibits 16, 17 ("the pounds have been secured"), 18-20,[12] and credit approval was assured. <u>James</u> Tr., p.65-66. Commonwealth then reneged on its agreement due to pressure from major distributors, *e.g.* <u>James</u> Tr., p.619, combined with EMJ's refusal to sell plaintiff the cut-to-length line. The refusal to fill plaintiff's metal orders was against Commonwealth's economic interests. The business Champagne Metals was bringing was profitable business Commonwealth had developed with Mike Champagne while he was with EMJ, <u>James</u> Tr., p.596-601, with significant potential – by June 2000, Champagne Metals was "the largest supplier to the $1 billion horse trailer market." <u>James</u> P-Exhibit 1, ALC 0020. The refusal also exposed the company to potential litigation and demonstrated that EMJ had been in contact with Commonwealth, informing Commonwealth that it would not sell plaintiff its cut-to length line, which plaintiff had to have to be recognized by Commonwealth or any other mill.[13]

The continued refusal of other mills, such as Ravenswood and Kaiser, to sell

---

[12]References to the <u>James</u> hearing transcript will be to "<u>James</u> Tr., p.  ___." References to the <u>James</u> Hearing Exhibits will be "<u>James</u> Exhibit P-__" (plaintiff's) and "<u>James</u> Exhibit D-___" (defendants'). References to exhibits submitted with plaintiff's proffer will be to "Proffer Exhibit" and to exhibits submitted with defendants' response to the proffer will be to "Response Exhibit."

[13]The distributorships clearly did not operate in a vacuum, but were cognizant of their competitor's activities. E.g., <u>James</u> Exhibit P-63 (in an email he sent to Samuel's president, Paul Sutcliffe, a sales vice president for the company, wrote that "[r]umour has it that Mike Champagne contacted Emmett Boyle directly trying to secure a distributorship." ); <u>James</u> Tr., pp. 179-80 (RASCO and Ryerson employees were found in plaintiff's buildings); Response Exhibit 11, pp. 67-68. Employees also moved within the industry from competitor to competitor.

Champagne Metals the same pounds they had previously supplied EMJ,[14] or, as in the case

of Ormet, to sell pounds it previously had sought to sell EMJ, makes little sense unless it was

to avoid, "what happened to Commonwealth." James Hearing Tr., p. 115.[15] There was no

evidence that Champagne Metals was financially unsound, produced inferior products,[16] had

an inadequate facility or machinery or failed to satisfy its customers. The evidence was to

the contrary. See James Tr., pp.1104-05; James Exhibits P-42, 43. The business Champagne

Metals offered, though small in volume, was consistent, a significant consideration for a

rolling mill, James Tr. pp. 598-99, and consisted in part of desirable "value-added products,"

which had a higher profit margin. Id.

Similarly unlikely, absent coercion, was Ravenswood's refusal to sell to plaintiff, once

it was acquired by Pechiney, plaintiff's foreign supplier, or Ormet's backtracking after it had

essentially committed to sell to plaintiff. See James Exhibits P-44 (email assigning

Champagne Metals a customer code); 52 (email dated 12/7/01 regarding final approval visit

for Champagne Metals); 50 (email dated 12/20/01 referring to "Exploratory Visit" to

---

[14]Once EMJ was no longer in the horse trailer business, these mills would not, by selling the same metal to Champagne Metals that it had sold to EMJ for the same customers, be taking pounds away from another distributorship. Proffer Exhibit 1, ¶16 .

[15]Despite its desire to reenter the horse trailer business, Kaiser refused to sell extrusions to plaintiff, not wanting to"get in between [Champagne Metals] and EMJ." James Tr., p. 135. Ormet also refused to sell to plaintiff even when it needed the business. James Tr., pp. 177-79. See id., p. 137 (Ormet called on Mike Champagne monthly when he worked at EMJ, trying to sell it metal).

[16]See James P-Exhibit 1, ALC 0020, (In a memo summarizing a visit to Champagne Metals in June, 2000, John Guest wrote that the company "ha[s] an excellent reputation for the processing of aluminum coil.").

Champagne Metals).[17]  The record contains persuasive evidence of continued pressure

imposed by the service centers on the various mills to compel them not to recognize

plaintiff, *e.g.* James Exhibits P-10, 25, 50;  James Tr., p. 1146; evidence that the threats to

pull pounds if a mill sold aluminum to Champagne Metal were taken seriously, *e.g.,* James

Exhibit P-25, 28; Keith Forniss video depo.; *see* James Exhibit P-29 (Recorded statement by

Ravenswood salesman that "[the mills] were essentially at the mercy of the Integrises and

the Samuels and the Ryersons of the world."); James Tr., pp.1146-48 (Sneigle of Ormet told

Champagne Metal's employee Borgelt that Ormet could not sell metal to plaintiff directly,

as Ormet would be punished by several distributors, but suggested selling the metal through

a third party); *see* Proffer Exhibit 4, ¶8; and evidence that Commonwealth lost business due

to its sales to Champagne Metals.  James Tr., pp.996-99.  Even Alcoa, one of the principal,

if not the premier, mills, expressed concern about  recognizing Champagne Metals because

"[r]elative to market coverage, they do compete with Ryerson, Rasco, VMG and we risk

---

[17]In this email from Keith Forniss, an Ormet salesman to Harry Sneigle, Ormet's
sales manager, Forniss states that Ormet "must thoroughly assess the long-term
ramifications against anticipated or projected dividend of recognizing this account.
Brenda [Mcinnis], Regional VP of Purchasing [of Samuels] has been quite candid and
clear in expressing concerns with Ormet selling this account.  In past as well as during
recent conversations that included Mr. Champagne she was most emphatic that our selling
this account would be looked at negatively by the Samuels ....  In no way am I suggesting
that we allow Samuels Specialty or anyone dictate our marketing efforts, however I am
only suggesting we weigh the significant tonnage generated by the Texas facilities and
Ms. McInnis consistent support of Ormet against expectations of significant business
from this account."  James Exhibit P-50.  See generally James Exhibit P-27(When asked
if increasing the pounds purchased from one-half to one million would persuade Ormet to
sell to Champagne Metals, Sneigle responded: "10 million pounds wouldn't help.").

losing more than we would gain." <u>James</u> Exhibit P-1.  After Commonwealth recognized plaintiff there still was incentive for the distributors to discourage other mills from selling it metal as plaintiff, with access to only one domestic mill, was at a pricing disadvantage. <u>James</u> Tr. pp. 641, 1051-53; 1125; and 402-04 in conjunction with <u>James</u> Exhibit P-75.[18]

Conceivably, the service centers could have been acting independently.  However, as each distributor was recognized by some, but not all the mills, absent coordinated action a single distributor could not cut off all of Champagne Metals' sources of supply.  Also, without knowledge that other service centers were simultaneously putting pressure on the same mill, a distributor, by threatening to move its business elsewhere, risked losing one of its suppliers.  Statements such as Phil Wiley's to the effect that, as long as Commonwealth was doing business with Champagne Metals, its ability to do business with AFCO, as well as others in the geographic region[19]  would be limited, <u>James</u> Tr. pp. 990-92, substantiate plaintiff's claim of concerted action among defendants.[20]

---

[18]The higher prices paid by plaintiff were due, in part, to cost reductions and rebates "Tier 3" distributors received because of the volume of their purchases. *<u>James</u> Tr., pp. 674-77.*

[19]Matthew Zundel testified that the reference to "others in that geographic region" was generally understood to be "the Rascos and the Vincent Metal Goods, and the Ryersons, and the other people in that general geographic region."  <u>James</u> Tr., pp. 991-92.

[20]Zundel assumed, based on his conversation with Phil Wiley and other customers within that geographic region, that, while the distributors were not in direct communication with each other, that the "others understood ... how the game is played ... that there are ... written and, quote,  unwritten rules of how you should be going to market , and who you should be selling as a mill supplier to distribution ... [and that Commonwealth] would be punished by the industry as a result of doing business with Champagne at that time."  <u>James</u> Tr., pp., 992-93. For obvious reasons, particularly when

The arguments that defendants were acting independently and were too competitive to ever collaborate become less persuasive in light of the testimony that a "greenfield start-up" was virtually unheard of in the industry.  *See* Proffer Exhibit 10, pp. 127-28.  Others before plaintiff –  Professional Metals, Orion, and MetalWest –  had tried, unsuccessfully, to become aluminum distributors.  Tr. pp. 437- 443.  For decades the number of service centers in the aluminum industry had not increased and the evidence demonstrated that defendants were motivated by their interest in maintaining stable prices[21] and their existing market share.[22]  Although the aluminum distribution industry is a competitive, if not cut-throat, business, the service centers had, in the past, collaborated on prices.  *See* James Tr., pp.171-72, pp. 917-18.[23]  They also, through the industry practice of incumbency, continue

---

dealing with sophisticated businessmen or women acquainted with the antitrust laws, the proof in an anti-trust case usually is circumstantial.  See James P-Exhibit 28, CM 19412 (Commonwealth employees were trained on antitrust).

[21]Plaintiff established that defendants believed Champagne Metals had disrupted the marketplace, see e.g. James Tr., pp. 793,795 and had or would negatively affect prices.  See  id. at pp. 793; 990-91; 1019.

[22]Garry Pierce, a Commonwealth sales representative testified that, while other service centers might be upset for a month or two when Commonwealth (or its predecessor) recognized a new distributor, the negative reactions to Commonwealth's recognition of Champagne Metals five years out were unique.  James Tr., pp. 796-97.  An obvious distinction for the lingering anger with respect to Champagne Metals was it was a new, versus an already existing, competitor/service center.

[23]See Standard Roofing, 156 F.3d at 469("Evidence that plaintiff's competitors/defendants] had actively considered fixing prices and allocating customers" prior to alleged conspiracy "to boycott and exclude [the plaintiff] from the market" was "sufficient to permit the inference that [the competitors] may have had a long-standing intent to stabilize prices in the roofing distribution business.")

to attempt to control their market share.[24]  However aggressive the service centers were in competing among themselves, they had a shared, common interest in excluding new entrants from the market.

The evidence, however, is far from conclusive and the court views the question addressed here as close.[25]  Defendants' conduct could be characterized, at least in part, as mere complaints, which were often made to employees who were not in a position to control a mill's selling decisions, <u>James</u> Exhibit P-28, CM 19407, CM 19411, and as efforts to protect incumbency.[26]  Plaintiff's lack of recognition by the mills was likely influenced, at least in part, by reasons other than pressure and threats from the other service centers, including the mills' preference for large distributors who purchase large amounts of metal and service a large number of customers.  Plaintiff also has been successful, has expanded, <u>James</u> Exhibit D-1, and, even with limited mill recognition, occasionally obtained pricing

---

[24]The comments of John Guest, an Alcoa manager, that "[r]elative to market coverage, [Champagne Metals] do[es] compete with Ryerson, Rasco, VMG and we risk losing more than we would gain" and that Champagne Metals "would be a location to recognize, if one of our existing distributors acquired them," <u>James</u> Exhibit P-1, evidence the mills' recognition of the distributors' desire to retain their market share.

[25]Evaluation of the testimony in this case is complicated by the fact that virtually every witness is potentially affected by self-interest.  A current employee of plaintiff or a service center has an obvious interest in not jeopardizing his or her employment.  Mill representatives may, due to concern with preserving service center or other client relationships, shade their testimony.

[26]In light of the absence of any objection to it by any party, the court assumes, without deciding, the industry practice of "incumbency," which protects in most circumstances a service center's relationship with a mill as to a particular customer, is unobjectionable in and of itself.

concessions.   <u>James</u> Exhibit D-2; <u>James</u> Tr., pp.1014-16.   Also, after it recognized Champagne Metals, Commonwealth's sales to many of the service centers increased, rather than decreased.  *E.g.*, <u>James</u> Exhibits P-32,33.

In light of this evidence, a different factfinder could reach a contrary conclusion as to the existence of a conspiracy and the identities of the coconspirators.  However, the court concludes plaintiff has met its burden of establishing by a preponderance of the evidence that an antitrust conspiracy was formed and that all defendants and mills were members.[27]  The court is not, at this time, determining the ultimate admissibility of the various statements the plaintiff seeks to introduce as coconspirator hearsay.  Whether a particular statement will be admissible will depend on the circumstances in which the statement was made, including whether it was made in the course of and in furtherance of the conspiracy, and the nature of the statement.

## II. <u>Daubert Challenge to Wilsey Testimony</u>

Defendants have moved to exclude the testimony of Steve L. Wilsey on <u>Daubert</u> grounds,[28] arguing that his estimate of plaintiff's claimed damages fails to meet the standards now set out in Fed. R. Evid. 702.[29]  The court conducted a hearing on the motion on October

---

[27]As noted above, Commonwealth initially was a member, but withdrew at some point, as indicated by its conduct relative to plaintiff.

[28]<u>Daubert v. Merrill Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).

[29]Rule 702 now substantially incorporates the principles set out in <u>Daubert</u>, which interpreted an earlier version of Rule 702.

29 and 30, 2008,[30] and has considered the briefs submitted by the parties.[31]  The court has

also had the benefit of the evidence offered at the <u>James</u> hearing referenced above, which has

been helpful as to context and background.

"In accord with [Rule 702], the Supreme Court has determined that the [trial judge]

'must ensure that any and all scientific testimony or evidence is not only relevant, but

reliable.'" <u>Bitler v. A.O. Smith Corp.</u>, 400 F.3d 1227, 1232 (10th Cir. 2004) (quoting

<u>Daubert</u>, 509 U.S. at 589), *cert. denied*, 546 U.S. 926 (2005).  This gatekeeper function

applies to all expert testimony, not merely to that deemed to be "scientific" in nature.  <u>Kumho</u>

<u>Tire Co. Ltd. v. Carmichael</u>, 526 U.S. 137 (1999).   Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise, if (1) the testimony
> is based upon sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

In determining the admissibility of expert testimony, the court initially must decide

whether the proposed expert is qualified to offer an opinion on the issues involved in the

particular case.  <u>Ralston v. Smith & Nephew Richards, Inc.</u>, 275 F.3d 965, 969 (10th Cir.

2001).  A qualified expert must possess the necessary knowledge, skill, experience, training

---

[30]Transcript references to testimony at the hearing are identified  as "<u>Daubert</u> Tr.,
p. ___".

[31]Plaintiff has sought leave to submit a post-hearing surreply brief [Doc. # 631].
However, as the court does not view the submissions at the hearing as materially
changing the issues already joined, the court concludes further briefing is unnecessary.

or education relevant to the facts at issue.  *Id.* The court then must conduct a two-part inquiry

to fulfill its <u>Daubert</u> gatekeeping role, determining first if the expert's proffered testimony

has "'a reliable basis in the knowledge and experience of his [or her] discipline.'" <u>Bitler</u>, 400

F.3d at 1232-33 (quoting <u>Daubert</u>, 509 U.S. at 592).   In making this determination, the

district court must decide whether the reasoning or methodology underlying the testimony

is scientifically valid.  *Id.* at 1233.  Second, the district court must inquire "into whether

proposed testimony is sufficiently 'relevant to the task at hand.'"  *Id.* at 1234 (quoting

<u>Daubert</u>, 509 U.S. at 597).  Is there an appropriate "fit" between the evidence offered and the

material issue to which it is directed?

Plaintiff offers Mr. Wilsey as an expert on the amount of plaintiff's damages.  His

opinions are directed to the amount of lost profits plaintiff has allegedly experienced by

reason of the claimed illegal agreement or conspiracy among the defendants.  As noted

above, plaintiff's theory of the case, broadly stated, is that defendants tacitly or explicitly

agreed to pressure the domestic aluminum mills, and did so, so as to cause the mills to deny

recognition to plaintiff or to otherwise limit its access to product at competitive prices.  Mr.

Wilsey concludes, assuming the establishment of the necessary agreement in restraint of

trade, that plaintiff has sustained total lost profits of $12,780,000 to $13,994,000 by reason

of the illegal agreement.  He concludes plaintiff's damages are of two types: (1) lost profits

in the amount of $8,844,000 from lost sales due to its inability to secure product from

domestic mills at competitive prices, and (2) lost profits due to the higher prices plaintiff

paid, relative to other distributors, for the product it did acquire.  Mr. Wilsey estimates this

latter type of damages to total between $3,936,000 and $5,150,000.[32]

Defendants have objected to Mr. Wilsey's testimony on a variety of grounds.  While some of defendants' objections are unpersuasive or would, in any event, go to weight rather than admissibility, the court nonetheless concludes, for the reasons set out below, that Mr. Wilsey's opinions do not meet the Daubert/702 standards for reliability and that they must therefore be excluded.[33]

Qualifications of Mr. Wilsey

Defendants do not attack Mr. Wilsey's qualifications to address, in general, the issue of lost profits or damages.  The evidence indicates he is a Certified Public Accountant with extensive experience in business valuations.  He is recognized by the American Institute of Certified Public Accountants as an accredited business valuator (ABV).  He has done over 300 business evaluations in connection with mergers and acquisitions, allocations of purchase price, shareholder disputes, and other commercial disputes.  These valuations have often involved projections or estimates of future earnings for particular entities.  He has testified in numerous court proceedings as to damages issues in a variety of contexts and has some limited experience with antitrust claims.[34]   Although Mr. Wilsey appears to have no

---

[32]Report of Steve L. Wilsey dated April 22, 2008 (the "Wilsey Report"), p. 16.

[33]It may be that there are certain data compilations or other matters to which Mr. Wilsey might properly testify notwithstanding this order.  However, his opinions as to the amount of lost profits must be excluded.

[34]His curriculum vitae identifies two cases in this court in which he has performed a damages analysis in connection with antitrust or similar claims.  Wilsey Report, Appendix 10.

prior experience or involvement with the aluminum distribution or metals industry,[35] the

court nonetheless concludes that he has, in general, the necessary knowledge, skill and

experience to address questions of lost profits and their calculation.

Reliability of Mr. Wilsey's opinions

The overall thrust of defendants' objection to Mr. Wilsey's proffered testimony is that

his conclusions are based on methodology which does not, for various reasons, meet the

standards of Rule 702.  In determining whether an expert's testimony meets the Rule's

reliability standard, Daubert and Rule 702 provide a non-exclusive list of factors which the

court should consider if they are applicable.   As the Comment to Rule 702 (2000

Amendments) notes:

> The specific factors explicated by the *Daubert* court are (1) whether the
> expert's technique or theory can be or has been tested — that is, whether the
> expert's  theory can be challenged in some objective sense, or whether it is
> instead simply a subjective, conclusory approach that cannot reasonably be
> assessed for reliability; (2) whether the technique or theory has been subject
> to peer review and publication; (3) the known or potential rate of error of the
> technique or theory when applied; (4) the existence and maintenance of
> standards and controls; and (5) whether the technique or theory has been
> generally accepted in the scientific community.

The Comment also identifies a number of other factors which may, in a proper case, be

relevant to the determination of whether expert testimony is sufficiently reliable.  These

---

[35]Mr. Wilsey's c.v. lists a variety of businesses which he has dealt with in his
business valuation or accounting practice; none reference the aluminum or metals
industry specifically.  Wilsey Report, Appendix 10, p. 1.  He does indicate he has
undertaken substantial efforts to acquaint himself with the aluminum distribution industry
for purposes of this case and the court is  persuaded he has done so.

include: (1) whether the expert proposes to testify about matters growing naturally and directly out of research he/she has conducted independent of the litigation, or whether the opinion was developed expressly for the purpose of testifying, (2) whether the expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion," (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful in his/her litigation consulting work as he or she would in their regular professional work, and (5) whether the particular field of expertise claimed by the expert is one known to reach reliable results for the type of opinion sought to be given. *Id.* Several of these factors are pertinent to the opinions sought to be offered by Mr. Wilsey.

As an initial matter, the court addresses several of defendants' objections which are not sufficient to warrant exclusion of Wilsey's testimony.  Defendants object to Wilsey's failure to apportion his damages estimate between legal and illegal conduct.  In part, they argue that he fails to identify those damages attributable to overt acts occurring before the limitations period (roughly April of 1998) versus those occurring after that date.  They rely on references to the issue in the previous decision of the Court of Appeals.  *See* Champagne Metals, 458 F.3d at 1090.  This court doubts whether the Court of Appeals' opinion, or the law generally, requires the sort of apportionment that defendants apparently seek.  In the circumstances existing here, where various acts (at least some of which are within the limitations period) are alleged to have contributed to a continuing conspiracy allegedly resulting in the mills' multiple refusals to deal with plaintiff on various occasions during the entire limitations period, it is difficult to see how any apportionment based on the timing of

21

particular overt acts could even theoretically occur.[36]  If the proof establishes that, based on the cumulative effect of multiple threats or other acts by defendants over a period of years, both prior to and within the limitations period, a mill refused to deal with plaintiff during the limitations period causing losses, how would a fact finder (or any expert purporting to assist the fact finder) effect an apportionment based on the overt acts?  Would the jury add up the pre-limitation and post-limitation threats/acts and somehow allocate on that basis?  Would it assess the ferocity of pre-limitation and post-limitation threats and try to figure out which acts really caused a particular mill to act in a particular way at a particular time?  In light of the disposition on other grounds of the challenge to Mr. Wilsey's testimony, it is unnecessary to resolve the matter here.  However, the court notes the seeming implausibility of the standard suggested by defendants and declines to rely on it as a basis for excluding Mr. Wilsey's testimony.

Defendants also suggest that Wilsey's opinions are irrelevant or unreliable due to his failure to apportion damages between defendants' unilateral conduct, which is not actionable in these circumstances, and their collective action, which is.  The court finds persuasive the reasoning of the Third Circuit in LaPage's Inc. v. 3M, 324 F.3d 141, 166 (3d Cir. 2003), where the court concluded that if the defendant's actions, taken as a whole, were found to violate the Sherman Act, it would be "unnecessary, if not impossible" to establish the sort

---

[36]The evidence does not suggest (or at least there is a factual question as to whether) any mill gave plaintiff a "final" refusal to deal in the sense discussed in Kaw Valley Elec. Coop. Co. Inc. v. Kansas Elec. Power Coop. Inc., 872 F.2d 931 (10th Cir. 1989).

of apportionment between legal and illegal conduct such as defendants seek in this case. This court is also mindful of the Supreme Court's guidance in <u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327 U.S. 251 (1946) that where a wrongdoer's own acts prevent a more precise ascertainment of damages, it must bear the risk of that uncertainty. *Id.* at 264-65. Violators of the antitrust laws rarely leave a clear paper trail or other evidence by which their collective actions might readily be separated from their individual actions. The necessary reliance on circumstantial evidence will often preclude any meaningful basis for apportionment.[37] In the circumstances of this case, the proffered opinions are not rendered irrelevant or unreliable by reason of their non-apportionment of damages between individual and collective conduct.

Defendants have also objected to Mr. Wilsey's testimony on the basis that he improperly and/or uncritically based his opinions on plaintiff's version of the facts or view of the case. Mr. Wilsey is offered as a damages expert and there is, in general, nothing objectionable about a damages expert assuming a plaintiff can establish liability. *See* <u>Champagne Metals</u>, 458 F.3d at 1080 n.4. He necessarily made certain assumptions as to the nature of plaintiff's case and circumstances and, to the extent he relied on factual information or projections from plaintiff's personnel, the court concludes he made sufficient inquiry and

---

[37]As noted in <u>Craftsmen Limousine Inc. v. Ford Motor Co.</u>, 363 F.3d 761, 771 (8th Cir. 2004): "Because defendants typically cannot be relied on to confess that they have entered into an unlawful agreement, conspiracy cases usually must be proved by circumstantial evidence."

investigation of the information to avoid excluding his opinions on that basis alone.[38]  It is true

that Mr. Wilsey's report is subject to some of the same criticisms that previously resulted in

the exclusion of the testimony and report of Dr. Murry.  *See* <u>Champagne Metals</u>, 458 F.3d at

1080 n. 4 (referencing Judge Cauthron's order excluding the Murry testimony).  With respect

to some of the statements in his report, it is unclear whether he is reciting facts relayed by his

client, which he assumed to be accurate, or whether he is confirming facts based on his own

investigation.  However, these deficiencies in the report, in and of themselves, are not

sufficient to warrant the exclusion of Mr. Wilsey's testimony.

Those rejected criticisms aside, the basis for the court's conclusion that Mr. Wilsey's

testimony must be excluded under Rule 702 is, at least in part, different for the two categories

of damages which Mr. Wilsey has identified: lost sales and price differential.

<u>Lost Profits Due to Lost Sales</u>

Mr. Wilsey concluded that plaintiff has experienced $8,844,000 in lost profits due to

lost sales.  He computed this number for the limitations period (part of 1998 through 2007)

by beginning with plaintiff's actual 1997 sales numbers and then adding to plaintiff's actual

sales experience in later years additional estimated sales based on various factors.  These

estimated additions resulted in percentage increases in the growth of sales, over and above

---

[38]The evidence indicated that, among other things, Mr. Wilsey interviewed some
customers of plaintiff, completed an intensive review of plaintiff's financial and other
information, and tested the accuracy of certain of the information given to him by
comparing it to actual facts as they later became known.  Under the circumstances, this
was a sufficient effort to verify the accuracy of the information provided so as to warrant
his using it in forming his opinions.

plaintiff's actual experience, of 10% for 1998, 33% for 1999 and 13% for 2000.[39]   His

estimates of sales in later years (2001 and after) corresponded, on a percentage basis, to the

growth rates actually experienced by plaintiff in those years, but the rates were applied against

the enhanced base due to the additions in, and compounding effect of,  prior years.[40]   Those

increased sales figures, coupled with Wilsey's analysis of plaintiff's cost structure and profit

margin, then resulted in the lost profits computation attributable to lost sales.[41]

The court concludes Mr. Wilsey's lost sales analysis is defective — and fatally so as

against Rule 702's standards — on two grounds.

First, Mr. Wilsey's calculation of plaintiff's lost sales is based not only on lost

aluminum sales — the focus of the alleged antitrust violation here — but also on plaintiff's

sale of steel during the various years, which, it appears, make up 75% of plaintiff's sales.[42]

 Mr. Wilsey testified as follows (Daubert Tr., pp. 69-70):

Q.  Now, your lost sales are calculated by looking at the increased growth rate
you project and applying it to Champagne's actual sales in the first year, and

---

[39]Wilsey Report, Schedule A-1.

[40]Wilsey made some offsetting adjustments in later years.  In years 2004 through
2007, Wilsey reduced the projected sales otherwise indicated for those years by adjusting
for what he termed "catch up sales" in the years when plaintiff had more extensive mill
access.  Wilsey Report, Schedule A-1.

[41]Wilsey Report, Schedules A (lost profits due to sales) and F (profit margin
calculations).

[42]Though somewhat unclear from the context, it appears from Mr. Wilsey's
testimony that non-aluminum sales constitute the bulk of  plaintiff's sales.  Daubert Tr., p.
70.  If that is the case, the inclusion of steel sales in the calculation plainly has a major
impact on the projections.

that projected sales in later years, correct?

A.  Yes, that's correct.

Q.  And those sales that you utilized are Champagne's total sales, including aluminum sales –

A.  Yes.

Q.  – and carbon steel sales, correct?

A.  Yes, sir.  I did that on purpose.

Mr. Wilsey may have done it on purpose, but that purpose is not disclosed by his testimony. It is not explained (or even mentioned) in his report, nor is there, so far as the court can determine, any other evidence which explains or justifies the inclusion of steel sales in an analysis of lost aluminum sales.  Plaintiff's counsel sought to explain inclusion of the steel sales numbers on the basis of "the familiar answer that sales are linked" and his assertion that persons buying aluminum "are also in the same transaction going to buy certain non-aluminum things." (Daubert Tr., p. 213).  Counsel's argument is not evidence, of course, and even if it was it would fall short, without more, of a persuasive explanation as to how lost aluminum sales necessarily lead to lost steel sales at some level or of what the relationship between them is.  It may be that there is some consistent, predictable relationship between aluminum sales and steel sales in this business such as would justify steel inclusion in the lost sales computation here.  However, it was not disclosed by Mr. Wilsey's testimony at the hearing, his report, or other evidence in the case.  Rule 702's requirement of "sufficient facts and data"  precludes simply assuming a connection in the present circumstances.

The second and more significant problem, in the court's view, with Mr. Wilsey's lost profits analysis is the fact that his estimate of lost sales is not based on any discernible, identifiable theory or technique.   Rather, it is based on his consideration of multiple factors, weighed and evaluated by him as a matter of professional judgment, but not otherwise disclosed.   His report indicates he considered 19 different factors in estimating lost sales. Wilsey Report, ¶ 57.   With respect to the widely varying estimates of growth for particular years, he narrows the considerations somewhat, but still fails to articulate any identifiable theory or technique to explain how he came up with particular results.[43]   He acknowledged there was no formula or particular principle or principles which guided his analysis, though he did test his assumption or estimates in various ways.[44]

Evaluating Mr. Wilsey's approach against the Rule 702 standards articulated in Daubert, it clearly does not pass muster.   There is no way that Mr. Wilsey's method or

---

[43]For example, paragraph 58 of the Wilsey Report states, in part: "I have estimated projected sales for Champagne Metals.   The projection begins with 10% higher sales in 1998.   This estimate is primarily due to the lost customers list, pricing, limited alloy breadth, and Commonwealth incumbency.   The next year 1999, I project 50% growth (up from Champagne's actual 17% growth or approximately $7mm in lost sales) based upon Champagne's actual growth, pricing, lost sales, MetalWest's performance, the incumbency of Commonwealth, limited alloy breadth, and Champagne's history of success later when having the ability to sell from multiple domestic mills."

[44]Daubert Tr., pp. 43-44.   Mr. Wiley explained how he tested his estimates of annual percentage increases this way (at 44): "I looked at several different sets of data that told me that this is in the ballpark, that my projection is in the ballpark, and it's reasonable.   I compared it to Champagne's own projections, and we spoke earlier about that, that were made in 1997.   I compared it to Champagne's later experience, the experience that Champagne had from '04 through '07."

technique can be or has been tested by others.  There is no way it can be challenged in any

objective sense, as it is simply his subjective judgment about how various factors fit

together.[45]  There is no identifiable theory or technique to submit to review by others.  There

is no real basis for estimating an error rate to his approach.  There are no standards of any kind

that have been identified as supporting it.  At base, Mr. Wilsey's methodology boils down to

this: "I started with Champagne's sales estimates, considered 19 factors, tested my estimates

in various ways, and, based on my professional judgment, arrived at X."  The way in which

those factors were put together and the conclusions that he drew are classic examples of

opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert."

General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Of the various factors identified for consideration in Daubert,[46] the only one that

arguably supports admission of Mr. Wilsey's opinions is whether the technique or theory has

been generally accepted in the scientific community (i.e. the pertinent community of

expertise).  Plaintiff argues that Wilsey's approach is like that routinely used in various

settings in making projections of profits.  Of course, the problem is that Mr. Wilsey's

"technique or theory" or multiple techniques or theories are never identified beyond saying

---

[45]As was suggested at the hearing, a jury would have little or no way to determine
whether an estimate by Mr. Wilsey of, say, 60% growth in a particular year was more or
less reliable than a competing expert's estimate of, hypothetically, 20% explained or
justified in the same way.

[46]The factors referenced in Daubert are non-exclusive and not a checklist, but are
helpful to varying degrees in assessing the testimony at issue here.

28

he exercised professional judgment.[47]   However acceptable such a basis for opinions or estimates may be in other contexts (or might have been in a pre-Daubert world),  it falls short of meeting the standard of reliability and helpfulness to the jury which guides a Rule 702 determination.

The court's conclusion in this regard is buttressed by the fact that there are several recognized ways in which lost profits may be established in an antitrust context.[48]  None are necessarily applicable or useful in all circumstances, and the court does not suggest that, in circumstances like those existing here, a lost profits determination can or should be reduced to a purely mathematical exercise.  They do, however, have the merit of suggesting at least some basis or starting point for an analysis and of identifying approaches which can be used and, if necessary, adjusted.[49]   Mr. Wilsey's approach, which is essentially subjective, does

---

[47]If intoning "professional judgment" was enough to otherwise justify an opinion in this context, the fact that Mr. Wilsey's familiarity with the aluminum distribution industry was acquired for purposes of this case and that he lacks prior experience with it would be more problematic.  However, the 702 standards require more in any event.

[48]The various authorities recognize at least three common approaches to measuring antitrust damages: (1) the before and after approach, (2) a yardstick or benchmark approach, and (3) regression analysis.  See generally, Conwood Co. L.P. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002).  Mr. Wilsey's analysis most closely approximates the "before and after" approach.

[49]The evidence suggests Mr. Wilsey initially used the experience of MetalWest as a basis for comparison, but later concluded it was not a useful "benchmark."  The retreat may have been unwise.  Though differences no doubt exist between the Champagne and MetalWest experiences, a more systematic comparison to MetalWest might have at least provided an identifiable baseline from which adjustments could be made.

not.[50]

In sum, Mr. Wilsey's estimate of Champagne's lost profits attributable to lost sales fails to meet the standards of Rule 702 and must be excluded.

<u>Lost Profits Due to Additional Product Cost</u>

Mr. Wilsey concluded that plaintiff has experienced lost profits of between $3,936,000 and $5,150,000 because of higher prices it paid, due to limited mill availability, for product it did acquire.  As with the lost sales projections, defendants attack the admissibility of the opinion on multiple grounds.

Unlike his analysis of lost sales, Mr. Wilsey's estimates as to higher product prices are based on an identifiable technique or method.  He undertook an extensive comparison of prices paid by plaintiff for various types of product at various times and compared those to prices paid by other defendant service centers in similar circumstances.  Based on these comparisons,[51] he estimated the additional product cost incurred by plaintiff during the pertinent periods and, based on a range of price differentials, a resulting range of estimated

---

[50]The failure to use or consider other recognized methods of analysis cuts against plaintiff's suggestion that <u>Bigelow</u> requires allowing the proffered testimony.  Although the wide variety of market factors and other considerations present here make the application of any theory or method complex and difficult, there is no apparent reason to assume that application of one or more of them would be any more difficult than in other antitrust cases or that any difficulty was specially attributable to the acts of defendants.

[51]The comparisons involved differences both in the per pound price paid by plaintiff for product and in the "adders" for width and gauge (additional amounts sometimes charged by mills depending on the width or gauge of the aluminum purchased.)

lost profits.[52]

Certain of defendants' objections, such as their arguments based on the number of times Mr. Wilsey used a particular Champagne contract as a basis for comparison in his calculations or the potential impact of external market forces, the court views as going to the weight potentially to be accorded the opinion, rather than to its admissibility.   However, defendants' objections based on Mr. Wilsey's alleged failure to account for alternative explanations of the damages he claims occurred raise more serious issues.

Defendants argue that Mr. Wilsey failed to take into account the limited mill access that plaintiff would have had even in the absence of the alleged conspiracy.  Mr. Wilsey acknowledged that a service center such as Champagne does not automatically become entitled to recognition by one or more mills simply by opening its doors and that mills may deny access for reasons unrelated to pressure from other service centers.[53]  There was considerable evidence offered at the James hearing to the effect that mills base their distributor recognition decisions, at least in part, on considerations of creditworthiness and the track record of the distributor in dealing with the ultimate purchasers of product.[54]  More

---

[52]Wilsey Report, ¶ 69; Schedule B and supporting schedules.

[53]Daubert Tr., pp. 15, 91-93.  At 91: "Q ...You also agree, don't you, that mills often decline to add service centers without any acts or pressure, correct?  A.  I'm sure that's true."

[54]Dealer recognition ordinarily involves an agreement for extension of a limited amount of short term credit.

pertinent to the circumstances here,[55] they also consider the number of distributors in particular areas and the number of dealer relationships they want to maintain.   In short, it is clear that mills do not automatically recognize all service centers and that service centers, including some or all of the defendants, routinely have access to less than all of the domestic mills.   The result is that, even in the absence of actionable pressure by competitors, a service center is not guaranteed access to the most favorable pricing of a product or to other benefits that customarily accompany being recognized by one or more mills.[56]

Mr. Wilsey acknowledges that his model does not take this factor into account in any specific way.   Rather, he states that he accounted for this by assuming that plaintiff would have sufficient mill access to cover or account for the differing price projections he otherwise came up with.   In effect, he has assumed that whatever unfavorable price differentials plaintiff experienced were due to the alleged conspiracy.   Plaintiff urges that it is reasonable for Mr. Wilsey to make such an assumption and that it would be up to plaintiff to establish at trial the reasonableness of that assumption.   While that may be so, in the face of clear evidence that mill recognition is not automatic and that no service center has access to all mills or products, it strikes the court as highly unlikely that plaintiff could ever prove that, but for defendants,

---

[55]There appears to have been no question as to Champagne's creditworthiness or as to the quality of its work (i.e. processing of the metal and the like).   Its overall service to customers appears to have been exceptional.

[56]Recognition also gives heightened access to depot stock (product maintained in inventory by the mill and hence more readily available to the distributor, without the distributor having to bear the capital cost of maintaining the inventory) and to price rebates.

it would have had sufficient access to achieve the most favorable pricing on every transaction or — more to the point here — whether it could count on pricing which, on average, equals that of larger and more established service centers.  At the very least, the failure of Mr. Wilsey's model to account for this factor in some fashion renders its reliability suspect.

If the matter of limitations on mill access even in the absence of distributor pressure was the only alternative explanation not sufficiently accounted for by Mr. Wilsey, the court might well conclude the omission, while significant, was not sufficient to bar admission of his opinion on cost damages.  However, it is not the only omission.  The far more significant omission is the failure of Mr. Wilsey's analysis to take into account, in any explicit sense, the impact of volume on pricing in the industry.

The evidence clearly established, and Mr. Wilsey does not dispute,[57] the volume of a mill's sales to a particular distributor affects the price at which the mill is willing to sell.   It is equally clear that Mr. Wilsey's model did not take volume into account:

> Q.  And you said just a few minutes ago that you would expect a larger volume purchaser to get a better price, correct?

> A.  Yes, sir.

> Q.  And, in fact, you made no adjustment in your purchase price calculations to account for the total effect of volume difference, did you?

> A.  I explained that.  That's correct.  And I explained it too.

---

[57]"The obvious issue is that Champagne is a small purchaser.  And I take — you take an Integris is buying several hundred million pounds, you obviously would expect some price differential."  <u>Daubert</u> Tr., p. 58 (Wilsey testimony).

Daubert Tr., p. 72.

One explanation Mr. Wilsey offered essentially was that Champagne, even though a new company, would have had purchases in sufficient volume to get the most favorable pricing.  He relied on a statement from Bill Thomas, a former mill representative and current employee of plaintiff, who explained in his deposition that it was industry practice for mills to take volume into account for pricing based on a three-tiered classification of distributors, with distributors who purchased the most product ("Tier 3" distributors) getting the most favorable prices.[58]  At the hearing, Mr. Wilsey initially suggested the projected levels of purchasing by plaintiff would have entitled it to Tier 3 status, based on Mr. Thomas' description of Tier 3 status as involving purchases of at least $30-40 million per year by the distributor.  However, Mr. Wilsey later acknowledged that the indicated purchasing level was not based on a distributor's total purchases from all mills, but was instead applied on a per mill basis.  And he appeared to concede that plaintiff would not have achieved that level with respect to any particular mill in the pertinent time frame.[59]  If Mr. Wilsey's non-treatment of the volume issue was due to his assumption that Champagne would have qualified for Tier

---

[58]Daubert Tr., pp. 131-135, recounting various portion of Mr. Thomas' 2008 deposition.

[59]Under Mr. Wilsey's sales projections, Champagne's purchases in total would not have exceeded $30 million until 2004.  Wilsey Report, Schedule A-1.  Thus, even if its purchases were grouped with a single mill (an assumption somewhat inconsistent with those underlying the sales projections), Champagne could not have achieved Tier 3 status with any mill until 2004.  (It is unclear to what extent the inclusion of steel sales in overall sales numbers might impact this comparison.)

3 treatment, it is clear there was no basis for such an assumption.[60]

Mr. Wilsey also sought to discount the impact of volume on pricing by suggesting that it was just one of many factors that affected pricing or a mill's interest in a particular distributor or that its impact was offset by other factors.[61]  No doubt there are factors other than volume which might affect a mill's pricing decisions, but there was no evidence offered to suggest that volume was unimportant.  Indeed, the evidence was clearly to the contrary.

The bottom line is that in failing to address the impact of volume on the prices being charged to Champagne for product, Mr. Wilsey failed to account for a significant and relatively obvious alternative explanation for the pricing differentials he found to exist as to plaintiff.  There are means by which he could have done so, but he did not pursue them.[62]  The potential significance of volume is clear.   Indeed, Mr. Wilsey could not foreclose the possibility that virtually all of the price differentials he relied on could be explained based on

---

[60]It is reasonably clear that the entire reference to Mr. Thomas' "tier" testimony reflected an after-the-fact scramble by Mr. Wilsey to solve a problem (the impact of volume) insufficiently addressed in his earlier work.  The deposition testimony of Mr. Thomas discussing the tier system occurred after Mr. Wilsey prepared his report. Daubert Tr., p. 74.

[61]Daubert Tr., pp. 74-75.

[62]Daubert Tr., pp. 77-78: "Q.  Now, if, in fact – there are statistical methods whereby you can look at purchase price differences, you could look at volumes and you could try to account for volume in determining the purchase prices difference after adjusting for volume, aren't there?  A.  Yes.  Q.  And you did not investigate those methods, did you?  A.  I felt like it was inappropriate, because like I say, there are numerous other factors that affect pricing by a mill, volume is one of them."

volume differences alone.[63]

In these circumstances, the court concludes Mr. Wilsey's opinion as to lost profits based on increased prices fails to meet the standards of Rule 702 and must be excluded.

In light of the court's prior conclusions as to the viability of plaintiff's case on the merits, and in light of the very substantial efforts Mr. Wilsey has obviously undertaken in connection with his report and related work, not to mention its considerable cost to plaintiff, the court reaches its decision as to the admissibility of Mr. Wilsey's opinions with considerable reluctance.  However, for the reasons stated, the court concludes that a fair application of Rule 702 requires their exclusion and that defendants' motion to exclude the opinions and report of Mr. Wilsey [Doc.# 518] must be granted.

III. Defendants' Renewed Motion for Summary Judgment on Damages

Defendants have moved for entry of summary judgment on the basis that Mr. Wilsey's testimony is inadmissible and that, without it, plaintiff cannot prevail as to damages.  They also argue, in light of the evidence that multiple mills now recognize plaintiff, that there is no basis for injunctive relief.

As to damages, defendants essentially contend that damages cannot be shown in this case without expert testimony.  They cite no authority supporting the notion that damages in an antitrust context may be shown only through the testimony of an expert witness.  While

---

[63]Daubert Tr., p. 73, referencing Wilsey's 2008 deposition testimony: "Q.  So it's fair to say that with the one exception of Metalwest, if we look at every single price comparison in your price damages, as far as you know it might be entirely due to volume differences?  A.  I don't know."

undoubtedly that is the common manner of establishing the extent of claimed damages, it is not a legal requirement.  Here, the court has previously determined there is evidence sufficient to create justiciable issues as to all elements of plaintiff's case.  While the exclusion of Mr. Wilsey's testimony will no doubt impact plaintiff's ability to establish meaningful damages to some extent, it does not necessarily negate the possibility that plaintiff can establish some damages.

As to plaintiff's claim for injunctive relief, the court has considerable doubt whether plaintiff can ultimately establish a basis for such relief in the circumstances existing here.[64] However, reaching that conclusion as a matter of law is premature.

The court concludes defendants' renewed motion for summary judgment [Doc. #519] should be denied.

## Conclusion

For the reasons stated, the court concludes that, for purposes of the admission of coconspirator hearsay, plaintiff has established that an antitrust conspiracy was formed and that all defendants and mills were members of it.  Defendants' motion to exclude the testimony of Roger Wilsey [Doc. # 518] is GRANTED.  Plaintiff's motion to submit a supplemental brief [Doc. #631] is DENIED.  Defendants' motion for summary judgment [Doc. 519] is DENIED.

---

[64]While the parties appear to differ as to how quickly Champagne's fortunes changed once it received recognition from additional mills, it appears reasonably clear that plaintiff now has mill access to a degree comparable with other service centers.

**IT IS SO ORDERED**.

Dated this 12th day of December, 2008.


JOE HEATON
UNITED STATES DISTRICT JUDGE